UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| American Dairy Queen Corporation, | CASE NUMBER: _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| James Tate Enterprises, Inc. and James Tate, | |
| Defendants. | |

Plaintiff American Dairy Queen Corporation ("ADQ"), for its Complaint against Defendants James Tate Enterprises, Inc. and James Tate, states and alleges as follows:

## IDENTIFICATION OF PARTIES

1. ADQ is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 7505 Metro Boulevard, Edina, Minnesota. ADQ is the franchisor in the Dairy Queen® franchise system.

2. Upon information and belief, Defendant James Tate Enterprises, Inc. is a corporation organized and existing under the laws of the state of North Carolina with its principal place of business also located in North Carolina.

3. Upon information and belief, Defendant James Tate is a citizen and resident of the state of North Carolina.

## JURISDICTION AND VENUE

4.  Through this action, ADQ seeks to enforce the post-termination obligations contained in a franchise agreement between ADQ and James Tate Enterprises. Defendant James Tate executed a personal guaranty in connection with that agreement through which he agreed to be personally bound by its obligations. Specifically, ADQ seeks to enforce a reasonable post-termination covenant against competition that Defendants accepted. ADQ also seeks to recover past due amounts owed by Defendants under the terms of their Operating Agreement with ADQ. This Court may exercise jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between the parties and the value of the rights ADQ seeks to protect exceeds $75,000.

5.  Venue is proper in this Court pursuant to Article 13(H) of the Operating Agreement, through which Defendants agreed that "any cause of action, claim, suit or demand allegedly arising from or related to the terms of this Agreement or the relationship of the parties shall be brought in the Federal District Court of the District of Minnesota or in Hennepin County District Court, Fourth Judicial District, Minneapolis, Minnesota."

## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

**A.  The Dairy Queen® Marks**

6.  The name Dairy Queen® was originated by ADQ's predecessor, McCullough's Dairy Queen, in 1940. Since its origination, the Dairy Queen® trademark and the other Dairy Queen® Marks have been used continuously by ADQ, its

predecessors, and those that ADQ and its predecessors have franchised or licensed to use them. The Dairy Queen® Marks have been used in connection with the sale of soft-serve, frozen and semi-frozen dairy products, frozen and semi-frozen drink products, cooked food products, and other products and services throughout the United States and in several foreign countries. Currently, over 4,700 Dairy Queen® restaurants exist and operate throughout the United States and abroad. Dairy Queen® restaurants operate under franchise or license agreements with ADQ or one of ADQ's territorial subfranchisors.

7.  ADQ and its affiliates are the owners of the federally registered Dairy Queen® trademarks and service marks that are licensed for use in Dairy Queen® restaurants (collectively the "Marks"). Most of the federally registered Marks are identified in the attached Exhibit A. ADQ and its predecessors have spent large sums of money advertising and promoting the Marks throughout the United States, including the state of North Carolina. To help assure the uniformity and quality of products sold under the Marks and to ensure that all Dairy Queen® restaurants are maintained in an attractive, uniform, and clean manner, ADQ and its predecessors have continuously devoted substantial amounts of time and money to the inspection of franchised restaurants. In addition, ADQ and its predecessors have spent substantial amounts of time and money to maintain and improve the Dairy Queen® franchise system. These substantial efforts include, but are not limited to: (1) the development, improvement, and inspection of machines used in the production and sale of Dairy Queen® products; (2) the maintenance of product quality; (3) the development of methods of improving the quality, taste, and

3

uniformity of products sold by franchise operators throughout the United States and abroad; (4) the development of uniform designs and markings for containers in which products are sold to consumers; (5) the licensing of the use of other ADQ trademarks to Dairy Queen® franchisees; and (6) the training and education of franchisees or their managers in the proper operation of Dairy Queen® restaurants. As a result of the efforts and expenditures of ADQ and its predecessors, the Marks have become associated in the minds of the consumer public with uniform products of consistently high quality, sold only in clean and attractive surroundings, and operated by persons following substantially identical sales and operating methods and procedures.

**B.     The Dairy Queen® Operating Agreement**

8.      James Tate Enterprises entered into an Operating Agreement with ADQ dated September 9, 1994. James Tate executed a personal guaranty in connection with the Operating Agreement through which he agreed to be "firmly bound by all of the terms, provisions and conditions of the foregoing Dairy Queen Operating Agreement..." A copy of the Operating Agreement and personal guaranty is attached as Exhibit B.

9.      The Operating Agreement granted Defendants the license and right to operate a Dairy Queen® restaurant located at 9013 Albermarle Road, Suite 200, Charlotte, North Carolina.

10.     Pursuant to Article 9(B) of the Operating Agreement, Defendants agreed to pay a monthly continuing license fee equal to 4% of their gross sales.

11.     Article 9(C) required Defendants to pay a separate monthly sales promotion fee to ADQ.

12. Pursuant to Article 12(c), Defendants agreed that ADQ could terminate the Operating Agreement upon a breach by Defendants. If Defendants were to abandon their franchised restaurant, ADQ could terminate their Operating Agreement by providing written notice of termination, which would be effective immediately.

**C.  Post-Termination Obligations**

13. Upon the termination of their franchise rights, Defendants agreed to comply with the terms of a reasonable covenant against competition. Article 13(C) of the Operating Agreement provides:

> Neither Licensee nor any of Licensee's Control Persons or Principal Owners shall directly or indirectly engage in any competitive business within 500 meters of the Authorized Location that existed immediately prior to termination for a period of one year after the date of termination by either party with or without cause.

14. In the event of litigation following the termination of the Operating Agreement, Article 12(A) provides that the prevailing party in such litigation would be entitled to recover its attorneys' fees and costs.

**D.  Defendants' Breach of the Operating Agreement**

15. Defendants breached the Operating Agreement by abandoning their Dairy Queen® restaurant. Defendants advised ADQ in July 2010 that they planned to abandon their Dairy Queen® franchise effective August 1, 2010. By letter dated July 26, 2010, ADQ confirmed Defendants' intention to abandon their restaurant and asked Defendants to sign a document formally terminating the Operating Agreement. That letter reminded Defendants of their obligation to pay all amounts owed to ADQ and to abide by the terms

of the Operating Agreement's covenant against competition. A copy of ADQ's July 26 letter is attached as Exhibit C.

16.    Defendants refused to sign the voluntary termination document that ADQ proffered. Accordingly, as provided by Article 12(C) of the Operating Agreement, ADQ sent Defendants a formal Confirmation of Termination letter dated August 18, 2010. That letter advised Defendants that ADQ had terminated the Operating Agreement effective July 31, 2010, the date on which Defendants abandoned their restaurant. ADQ again reminded Defendants of their obligation to abide by the post-termination covenant against competition and pay all amounts owed to ADQ. A copy of ADQ's August 18 letter is attached as Exhibit D.

17.    Defendants failed to comply with their post-termination obligations. First, Defendants failed to pay any of the amounts owed to ADQ. On April 15, 2010, James Tate Enterprises signed a Promissory Note with ADQ in the amount of $4,500. The Promissory Note memorialized the past due fees owed by Defendants at that time under the Operating Agreement. The note provided that any default by Defendants under the Operating Agreement would also constitute a default under the Promissory Note. A copy of the April 15 Promissory Note is attached as Exhibit E. In addition to the $4,500 Promissory Note, Defendants also owe ADQ an additional $11,383.56 for additional continuing license fees and sales promotion fees that have accrued under the Operating Agreement. In total, Defendants owe ADQ $15,986.46, plus accrued interest.

18.    Second, Defendants refused to comply with the covenant against competition they accepted. In plain violation of that restrictive covenant, Defendants

converted their Dairy Queen® restaurant into a restaurant named "Mooglies." That restaurant continues to sell the same menu items that Defendants sold when they were Dairy Queen® franchisees. Among other things, Defendants continue to sell hamburgers, chicken strips, hot dogs, and chicken sandwiches. Defendants also continue to sell soft serve ice cream and other treat products designed to mimic the menu available in licensed Dairy Queen® restaurants. In fact, Defendants' competing restaurant bears a sign that proclaims "Same owner new name."

19. When ADQ learned of Defendants' continued unlawful competition, it sent a letter to Defendants dated October 4, 2010. In that letter, ADQ advised Defendants that their operation of the "Mooglies" restaurant constituted a violation of their post-termination covenant against competition. ADQ warned Defendants that continued failure to abide by that restrictive covenant would cause ADQ to commence legal action. A copy of ADQ's October 4 letter is attached as Exhibit F.

20. Defendants have ignored ADQ's demands and continue to operate a competitive restaurant from the same location as their formerly licensed Dairy Queen® restaurant. Defendants have also refused to pay the past due amounts owed under their Operating Agreement and Promissory Note. Defendants' recalcitrance has left ADQ no alternative but to commence the instant action.

## COUNT I

## **BREACH OF CONTRACT—FEES OWED UNDER OPERATING AGREEMENT AND PROMISSORY NOTE**

21.   ADQ incorporates herein by reference the preceding paragraphs of this Complaint.

22.   Articles 9(B) and (C) of the Operating Agreement require Defendants to pay monthly fees to ADQ based on the gross sales of their franchised restaurant.

23.   Article 9(D) of the Operating Agreement requires those fees to be submitted by no later than the tenth day of each month for sales made during the preceding month.

24.   Article 10(A) provides that interest shall accrue on all outstanding amounts owed under the Operating Agreement at the rate of 18% per annum or the maximum rate permitted by law.

25.   By executing a personal guaranty, James Tate agreed to be equally responsible for amounts owed under the Operating Agreement.

26.   The above-referenced Defendants breached the Operating Agreement by failing to pay fees owed to ADQ.

27.   Defendants have also failed to make payments owed under the Promissory Note executed by James Tate Enterprises.

28.   ADQ is entitled to damages in the amount of $15,986.46 for past due fees owed under the Operating Agreement and Promissory Note, plus accrued interest. ADQ will prove the precise amounts due at the trial of this matter.

29.   ADQ is entitled to recover its costs, expenses, and attorneys' fees incurred in this action, pursuant to Article 12(A) of the Operating Agreement.

## COUNT II

### BREACH OF CONTRACT-- COVENANT NOT TO COMPETE

30.   ADQ incorporates herein by reference the preceding paragraphs of this Complaint.

31.   Under Article 13(C) of the Operating Agreement, Defendants agreed that "neither Licensee nor any of Licensee's Control Persons or Principal Owners shall directly or indirectly engage in any competitive business within 500 meters of the Authorized Location that existed immediately prior to termination for a period of one year after the date of termination by either party with or without cause."

32.   Defendants have breached Article 13(C) of the Operating Agreement by continuing to engage in a competitive business within the radius prohibited by the Operating Agreement.

33.   ADQ has a legitimate business interest in its valuable confidential business information, substantial customer relationships with customers in this area, and the goodwill associated with ADQ's trademarks in the territory governed by the Operating Agreement.

34.   As a result of Defendants' continued operation of a directly competitive restaurant in the same territory licensed under the Operating Agreement, ADQ has suffered irreparable harm and will continue to suffer such harm.

35. ADQ has no adequate remedy at law to protect its substantial business and property rights, and the damage from Defendants' activities is considerable and continuing and thus not capable of ascertainment at this time.

## COUNT III

### MISAPPROPRIATION OF GOODWILL

36. ADQ incorporates herein by reference the preceding paragraphs of this Complaint.

37. Defendants' breach of their covenant against competition constitutes unfair competition and misappropriation of ADQ's valuable goodwill, reputation and business property.

38. ADQ has had a longstanding presence in the North Carolina market, such that ADQ's trademarks have developed substantial customer recognition and goodwill.

39. By operating a directly competitive restaurant from the same location for the same customers, Defendants have misappropriated ADQ's goodwill and are using that goodwill for their direct benefit and profit.

40. As a direct result of Defendants' actions, as described in the preceding paragraphs, ADQ has been damaged.

41. ADQ is entitled to an accounting of Defendants' earnings and revenues for their unauthorized misappropriation of ADQ's goodwill for the time period after termination of the Operating Agreement.

## COUNT IV

## BREACH OF CONTRACT-ATTORNEYS' FEES & COSTS

42. ADQ incorporates herein by reference the preceding paragraphs of this Complaint.

43. Under Article 12(A) of the Operating Agreement, Defendants agreed to pay reasonable attorneys' fees and costs to ADQ in the event that a breach or threatened breach of that agreement caused ADQ to commence legal proceedings to enforce Defendants' obligations.

44. ADQ was forced to commence this civil action to stop Defendants' breach of the covenant against competition and to collect amounts owed under the Operating Agreement and Promissory Note.

45. ADQ is entitled to recover its attorneys' fees and costs, in an amount to be proven at trial.

**WHEREFORE**, ADQ prays for judgment against Defendants as follows:

1. For damages in the amount of the past due fees owed under the Operating Agreement and Promissory Note together with accrued interest, in an amount to be proven at trial but which is at least $15,986.46.

2. For a permanent injunction against Defendants, their directors, officers, members, agents, servants, and employees, and all others in active concert or participation with them, from directly or indirectly engaging in any competitive business within a 500 meter radius of the location of Defendants' formerly licensed Dairy Queen®

restaurant for a period of one year from the date Defendants are first in compliance with their contractual post-termination obligations;

3. For an accounting of Defendants' revenue, earnings and profits for the purpose of determining additional damages owed to ADQ as a result of Defendants' unfair competition;

4. For ADQ's costs, disbursements, costs of investigation and attorneys' fees incurred in this action pursuant to the terms of the Operating Agreement; and

5. For such other and further relief as the Court deems just and equitable.

> GRAY, PLANT, MOOTY, MOOTY
> & BENNETT, P.A.
>
> By: _____
> Jason J. Stover (#30573X)
> 500 IDS Center
> 80 South Eighth Street
> Minneapolis, MN  55402
> Telephone:  (612) 632-3000
> Facsimile:  (612) 632-4300
> jason.stover@gpmlaw.com
>
> **ATTORNEYS FOR PLAINTIFF**
> **AMERICAN DAIRY QUEEN**
> **CORPORATION**

GP:2883052 v1